IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

DAVID J. WILDE,                     )
                                    )
                                    )
            Plaintiff,              )            4:05CV3293
                                    )
                                    )
        v.                          )
                                    )      **MEMORANDUM AND ORDER**
                                    )
CITY OF LINCOLN,                    )
                                    )
                                    )
            Defendant.              )
                                    )
_____

This matter is before the court upon defendant's motion for summary judgment. Filing 27. The plaintiff, David J. Wilde ("Wilde") claims he was actually or constructively discharged from his employment with the City of Lincoln ("City") for exercising or attempting to exercise rights secured under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654. He also claims the City's conduct violated the Americans With Disabilities Act , 42 U.S.C. §§ 12101-12213 (the "ADA"). [1]

Wilde has submitted evidence in response to this motion, and the City has moved to strike that evidence. Filing 37. The City argues that Wilde's evidence must be stricken because his declaration, (filing 33, ex. 1), is undated, contains conclusory and unsupported statements, addresses time periods beyond the scope of plaintiff's

_____

[1] Count II of the plaintiff's complaint alleges violations of Nebraska's Fair Employment Practices Act ("FEPA"). However, the plaintiff has dismissed Count II as "untimely and duplicative of the 3[rd] cause of action under the ADA." Filing 17 (Report of Parties' Planning Conference), p. 11, ¶ 12.

discrimination claim, and includes attachments for which no requisite foundation was laid.   Filing 38 (defendant's brief–motion to strike).

I have reviewed the plaintiff's evidentiary submission.   The exhibit F attachment to Wilde's declaration appears to be a July 28, 2004 medical record of Susan Johnson, M. D.  Filing 33, ex. 1 (Wilde's declaration), ex. F.  The plaintiff has provided no foundation for the admissibility of this medical record, no evidence that exhibit F was ever presented to the City, and no evidence that the City was aware of the information within this document when reaching any decisions regarding Wilde's employment.[2]   The document is therefore hearsay and irrelevant.  To the extent the defendant has moved to strike the July 28, 2004 medical record of Susan Johnson, M. D, filing 33, ex. 1 (Wilde's declaration), ex. F, the defendant's motion will be granted.

As to the statements within Wilde's undated declaration, and the remaining attachments to that declaration (which appear to be records created by the City or the plaintiff's college transcript provided to the City), I need not rule on the merits of the City's motion to strike because I find that even considering this evidence, the plaintiff's evidence fails to create an issue of fact in response to defendant's motion.

Accordingly, the defendant's motion to strike Dr. Johnson's July 28, 2004 medical evaluation will be granted, but the remainder of defendant's motion to strike will be denied.  For the reasons discussed hereafter, I further conclude that the City's motion for summary judgment, filing 27, should be granted.

---

[2]See footnote 3 for a detailed explanation of this ruling in the context of the facts presented by the parties.

## STATEMENT OF FACTS

### Overview of Wilde's Claims

Wilde was employed by the City from February 2, 1998 until August 31, 2004. The parties have stipulated that during the entirety of this employment, Wilde was able to perform the essential functions of his job without accommodation, he never asked for any accommodation, and he did not otherwise trigger an "interactive process" under the ADA.   Whether or not the City violated the ADA by failing to provide a reasonable accommodation is not at issue.   Filing 29, ex. E (Reuter affidavit), att. 1 (Wilde deposition), 36:9-17; filing 33, ex. 1 (Wilde declaration), ¶ 4.

Wilde claims the City discriminated against him from June 22, 2004 until August 1, 2004.   Filing 29, ex. E (Reuter affidavit), att. 5 (Amended NEOC charge of Discrimination).  Wilde contends that the City interfered with his exercise of rights afforded by the Family Medical Leave Act ("FMLA") or retaliated against him for exercising those rights, and discriminated against him based on his disabilities and/or the disabilities of his family members in violation of the Americans with Disabilities Act ("ADA"). He claims that once the City became aware of his mental health problems and the disabilities of his family members, the City imposed discipline on him for conduct that either did not occur or was routinely overlooked when performed by other employees, counseled him regarding excessive use of sick leave, gave him a poor performance evaluation in 2004, and denied him his 2004 annual merit raise. Filing 33, ex. 1 (Wilde declaration), ¶¶  3 & 4.  Wilde claims he ultimately resigned from his City employment because of this ongoing harassment and to avoid being fired.

### Wilde's City Employment

Wilde was initially hired to fill a temporary position in Animal Control, but began full-time, regular employment for the City as an Animal Control Officer I on July 9, 1998. Filing 29, ex. D (Kant affidavit), ¶2. On December 13, 2001, Wilde was promoted to Animal Control Officer II.  Filing 29, ex. D (Kant affidavit), ¶2. Wilde's City employment ended on August 31, 2004 when, following a pre-disciplinary hearing, he tendered his resignation before the City made any decision regarding whether or to what extent discipline would be imposed. Filing 29, ex. A (Dart affidavit), ¶9; ex. E (Reuter affidavit), att. 1 (Wilde deposition), 4:1-5:6.

### The Disabilities and/or Illnesses of Wilde and his Family Members

During his employment for the City, Wilde was diagnosed with Bipolar Disorder and Posttraumtic Stress Disorder (PTSD). Filing 33, ex. 1 (Wilde declaration), ¶ 1.   In early 2004, Wilde told his immediate supervisor, John Scott Lowry ("Lowry"), that he had been diagnosed with Bipolar Disorder. Filing 33, ex. 1 (Wilde declaration), ¶ 3.  The record does not reveal when, if ever, the City was apprised that Wilde also suffered from PTSD.   There is no evidence stating when Wilde's mental health problems were initially diagnosed, or when any symptoms of these mental health problems began.

Wilde slept, on average, five or six hours per night during his employment with the City. Filing 29, ex. E (Reuter affidavit), att. 2 (Wilde deposition), 54:19-25. However, he claims he would wake up 2-3 times a night and was sometimes unable to get back to sleep. Filing 29, ex. E (Reuter affidavit), att. 2 (Wilde deposition), 54:1-18; filing 33 , ex. 1 (Wilde declaration), ¶ 16.  Wilde has above-average intelligence, (filing 29, ex. E (Reuter affidavit), att. 2 (Wilde deposition), 63:15-18), but claims he can have difficulty "bringing that intelligence to the surface." Filing 33 , ex. 1 (Wilde declaration), ¶ 17.  There is no evidence, however, that any

4

symptoms related to Bipolar Disorder or PTSD ever prompted Wilde to call in sick, impacted his ability to perform his job, or substantially limited his ability to perform tasks central to most people's daily lives.

Wilde's son, Denver, was born prematurely on March 15, 2002. Denver was hydrocephalic at birth, has Asbergers Syndrome, and had difficulty learning to walk properly. Wilde's wife has diabetes, chronic migraines, narcolepsy, and limited mobility in her neck due to past cervical fusion surgery. Wilde's stepson, Aaron, is bipolar, has oppositional defiant disorder, and has now been diagnosed with PTSD. Filing 33, ex. 1 (Wilde declaration), ¶ 1.

## Wilde's Use of Sick Leave

City ordinances and/or union agreements provide for and regulate the use of paid "Family Sick Leave" or "Sick Leave" by City employees. Filing 41, ex. A (Taute affidavit), ¶¶ 5 & 10, and att. 7. For City employees such as Wilde, the rights afforded and procedures employed for obtaining sick leave benefits and Family Medical Leave are separate and distinct. Filing 41, ex. A (Taute affidavit), ¶¶ 5 & 6, and atts. 4 & 5. During Wilde's employment with the City, he accrued eight hours of sick leave for every full month of service. Wilde was allowed to use sick leave as it accrued for his own medical needs, ("Sick Leave"), and could use up to forty hours of his accrued sick leave to care for an immediate family member with an illness or to attend physician appointments, ("Family Sick Leave"). As to the forty hour limit, an employee could also submit a written request that the limit be waived. The Personnel Director was authorized to grant this request upon review of an employee's individual circumstances. Filing 41, ex. A (Taute affidavit), att. 6, § 1 (A-C). The leave provisions applicable to Wilde stated, "Sick leave with pay must be earned before it can be taken and advancing sick leave is prohibited." Filing 41, ex. A (Taute affidavit), att. 6, § 1 (B).

5

Wilde received performance evaluations for his City employment each year in June.  His evaluation record for the period ending June 13, 2002 included a listing of his leave record for the 2001 calendar year, and the 2002 calendar year through March 2002.  Wilde used 100.50 hours of sick leave during the 2001 calendar year and 5.50 hours of Leave of Absence for illnesses and injuries for himself and immediate family members.   Filing 33, ex. 1 (Wilde declaration), ex. A, pp. 5-6.

On May 7 and 8, 2003, Wilde called in sick but did not have enough accumulated sick leave to be paid for this time.  On May 9, 2003, Lowry and Animal Control Chief James Weverka ("Weverka") spoke to Wilde regarding his sick leave usage.  The City encouraged Wilde to build up his sick leave so it would be available in the event of a major illness.   Though Wilde indicated he would strive to decrease his use of sick leave, he further explained that his past use of sick leave was high because he needed to care for himself and his son.[3]    Filing 33, ex. 1 (Wilde declaration), ex. D.

Wilde's performance evaluation for the period ending June 13, 2003 stated:

> David has a very high rate of sick leave usage and at times exceeds his sick leave hours.  He needs to take steps to decrease his sick leave usage including family whenever possible.   He has been given a verbal warning on this matter.

Filing 33, ex. 1 (Wilde declaration), ex. B, p.5.

─────────────────────

[3]Citing to exhibit D of Wilde's declaration, the plaintiff's brief states that during the May 9, 2003 meeting, Wilde "made reference to his wife's and son's medical conditions as reasons for missing work."  Though Wilde apparently missed work because of complications of his wife's pregnancy in 2001 and until March of 2002, (filing 33, ex. 1 (Wilde declaration), ex. A, pp. 5-6), Exhibit D makes no reference to any medical conditions of Wilde's wife which necessitated any  absences discussed during the May 9, 2003 meeting.

6

There is no evidence of record stating that any of Wilde's work absences during his employment with the city were caused by his Bipolar Disorder or PTSD.[4] There is no evidence that Wilde used sick leave due to his son's or stepson's disabilities or serious health conditions. Other than perhaps the pregnancy complications his wife encountered in 2001 and until the birth of Wilde's son in March of 2002, there is no evidence of record stating Wilde used sick leave due the his wife's illnesses or disabilities.

On July 9, 2004, Weverka sent a letter to Wilde stating that it had been brought to his attention that Wilde may have a serious health condition.[5]  Weverka asked

---

[4]Wilde has offered a medical record of Susan Johnson, M.D. as evidence in opposition to the City's motion for summary judgment.  Filing 33, ex. 1 (Wilde declaration), ex. F.  This record is merely attached to Wilde's declaration and no foundation is laid for its admissibility.  If offered for the truth of the matter asserted, it is inadmissible hearsay.  Moreover, it is dated July 28, 2004 (two days before Wilde tendered his resignation), and there is no showing it was ever provided to the City.  It cannot, therefore, be offered to prove the City considered the information in this document when discussing Wilde's past use of sick leave, potential use of Family Medical Leave, or potential discipline for the matters addressed at the July 27, 2004 pre-disciplinary hearing.  Finally, although this medical record states Wilde was returned to work without restrictions on July 13, 2004, the plaintiff has not presented any evidence explaining the history behind this statement or its potential meaning in this case.  Specifically, there is nothing of record stating Wilde was ever off work or worked subject to restrictions due to his Bipolar Disorder or PTSD and if so, when that occurred.  Most importantly, there is no evidence the City was ever apprised of any earlier determination by Dr. Johnson concerning Wilde's ability to work related to his Bipolar Disorder or PTSD. Accordingly, the medical record of Susan Johnson, M.D., (filing 33, ex. 1 (Wilde declaration), ex. F.), is irrelevant and hearsay, and was therefore not considered in ruling on the City's summary judgment motion.

[5]Citing exhibit E of his declaration, (filing 33, ex. 1 (Wilde declaration), ex. E), Wilde's brief states that his past treatment by the City, and particularly his

7

Wilde to have his physician complete a Medical Certification Form and return it to Weverka as soon as possible. Filing 33 , ex. 1 (Wilde declaration), ex. E. The letter explained:

> Unpaid Family Medical Leave will begin after the exhaustion of your 17.83 hours of accrued sick leave less any time you took on July 8[th]. Please complete the enclosed leave request for the time taken on July 8, 2004 for payroll purposes. If you wish to remain in a paid status you have the option of using your 60.44 hours of accrued vacation. . . .
>
> For your information, I have enclosed a copy of City Personnel Policy Bulletin No. 2004-1, regarding FMLA leave.

Filing 33 , ex. 1 (Wilde declaration), ex. E.

Pursuant to City employment policies, City employees requesting FMLA leave due to a serious health condition of the employee or qualifying family member must submit an application for leave and a Medical Certification Statement Form completed by his or her health care provider. The FMLA application must state the reason for the leave and the starting and ending dates of the leave. Filing 41, ex. A (Taute affidavit), ¶¶ 2-5, and atts. 1-4.

During the entire time Wilde worked for the City, he never requested FMLA leave in accordance with the City's policy, and he was never denied access to the

---

receipt of the July 6, 2004 notice of a pre-disciplinary hearing and the allegations within that notice, was "so distressing he was forced to take time off and provided the [City] a note from his doctor that he needed to be off for medical reasons." Filing 32, (Wilde's brief), p.3. This statement in the brief is not supported by the record. There is nothing of record indicating how it came to Weverka's attention that Wilde may have a serious health condition as of July 9, 2004, or that there was a note produced by a doctor related to taking time off for this condition. See also footnote 3.

8

City's FMLA benefits.  Filing 29, ex. E (Reuter affidavit), att. 2 (Wilde deposition), 16:15-21; filing 41, ex. A (Taute affidavit), ¶¶ 8-9.  Every time Wilde requested sick Leave for his own medical needs, or Family Sick Leave for the needs of a family member, his request was granted.  Filing 29, ex. E (Reuter affidavit), att. 2 (Wilde deposition), 11:14-12:4, 12:20-13:13, 16:21-17:25, 19:22-24.

### Disciplinary Actions and Performance Evaluations

1.      The Snapping Turtle Incident.

On June 2, 2004, a citizen complaint was lodged against Wilde.  Tracy Lacey alleged Wilde confronted her about a snapping turtle she picked up from the middle of a road on May 29, 2004.  Filing 29, ex. B (Weverka affidavit), ¶3 and att. 2. Lacey's signed written complaint stated Wilde demanded that Lacey give him the turtle and when she refused, he followed her vehicle in his Animal Control vehicle with his overhead yellow lights activated, exceeding the posted speed limit during the pursuit.  Lacey's complaint further stated that Wilde followed Lacey to her mother's house and when she parked in the driveway, Wilde used his vehicle to block her in the driveway, approached her in a threatening manner, and demanded the snapping turtle.   Filing 29, ex. B (Weverka affidavit), ¶3.

The City claims Animal Control Officers are prohibited from using their overhead yellow lights while driving–that such lights are to be activated to signal a stopped Animal Control vehicle so that other motorists see the vehicle and proceed with caution. Filing 29, ex. B (Weverka affidavit), ¶3.  Wilde claims he properly used his overhead yellow lights as a caution in accordance with his training, and that he did not use the lights to initiate a traffic stop.  Wilde denies that the snapping turtle incident occurred as described by Lacey, and specifically states he did not break any traffic laws.  Wilde further states it is not uncommon to follow someone to investigate and to park behind a car when performing the responsibilities of an Animal Control

9

Officer.  Finally, he claims public complaints to Animal Control are common and usually ignored.  Filing 29, ex. B (Weverka affidavit), att. 2; filing 33, ex. 1 (Wilde declaration), ¶¶ 7 & 8.

      2.      The Computer Usage Incidents.

The City has a computer use policy which prohibits employee use of City computers for non-work related purposes.  Filing 29, ex. A (Dart affidavit), ¶2.  Wilde signed and acknowledged receipt of this policy on March 25, 2000.  On August 8, 2000 and October 2, 2000, written reminders were issued to all Animal Control staff concerning the computer use policy and warning that employees could be terminated for violating the policy.   The city issued a written warning to Wilde on April 11, 2002 regarding his misuse of City computers.   Filing 29, ex. A (Dart affidavit), ¶2 and att. 1.

As Wilde was working on his computer on June 19, 2004, Lowry noticed Wilde's computer screen and believed Wilde was playing a game on his work computer.  Filing 29, ex. C (Lowry affidavit), ¶ 3.  According to Wilde, the object on the computer screen was a "pop-up" with a frog on it.  Wilde states he does not know what the "pop up" did, or whether it was a game, but he knows he was not playing a game on the computer.  Filing 33, ex. 1 (Wilde declaration), ¶ 6.  He states that after personally receiving a warning on April 11, 2002, he never misused the City's computers and "avoided computer issues of that kind."  Filing 33, ex. 1 (Wilde declaration), ¶ 5.

Lowry did not say anything to Wilde about the "computer game" incident at the time, (filing 33, ex. 1 (Wilde declaration), ¶ 5), but did discuss it with Weverka. Filing 29, ex. C (Lowry affidavit), ¶ 4.   On June 22, 2004, Weverka and Lowry jointly spoke to Wilde concerning both the snapping turtle complaint and Wilde's use of the work computer for playing games.  During the June 22, 2004 meeting, Wilde

was given a written reprimand for his misuse of the City computer for the period May 7, 2004 through June 19, 2004, (filing 29, ex. A (Dart affidavit), att. 2), and a written warning for the snapping turtle incident.  Filing 29, ex. B (Weverka affidavit), att. 1; ex. E (Reuter affidavit),  att. 2 (Wilde deposition), 85:1-13.  Wilde acknowledged receipt of the reprimand and warning.  However, on the warning he wrote,  "Disagree not factual, other parties not present to witness issues they reported.  Acted within policy.  Speeding never occurred."  Filing 29, ex. B (Weverka affidavit), att. 1.   On the reprimand for unauthorized computer usage, he wrote, "Disagree–such time not spent on sites provided."  Filing 29, ex. A (Dart affidavit), att. 2.

Improper use of City computers was an ongoing problem for the Animal Control department.  On July 15, 2004, Weverka again reminded "All Staff" that City computers were to be used for work purposes only.  Weverka's notice advised the employees that one of Animal Control's new computers had so many viruses that it had to be completely wiped out and re-imaged.   New login and logout procedures were implemented by the department.  Filing 29, ex. A (Dart affidavit), ¶ 2 & att. 1.

3.     The Restaurant Incident.

On June 23, 2004, Plaintiff drove his City vehicle, while off duty and in uniform, to a Lincoln restaurant where he dined with his wife.  Filing 29, ex. A (Dart affidavit), att. 3; ex. E, att. 2 (Wilde deposition), 168:10-169:10.  Both the use of the vehicle in such a manner and the wearing of the uniform while off-duty and in a public restaurant eating a meal violate City policy.  Filing 29, ex. A (Dart affidavit), ¶4 and att. 3.

Wilde does not deny the restaurant incident.  Filing 29, ex. E, att. 2 (Wilde deposition), 168:10-169:10.  However, he explains that he was on call on June 23, 2004 and therefore had to drive his Animal Control vehicle home.  He states that as he was leaving work and still in uniform, he received an urgent call from his wife

11

stating she had pulled over into a mall parking lot because her blood sugar had dropped dangerously low.  She needed to eat immediately.  Since Wilde had the checkbook, he picked his wife up and took her out to dinner at a restaurant.  Filing 33, ex. 1 (Wilde declaration), ¶ 12.

        4.      The 2004 Performance Evaluation–Denial of Raise.

The plaintiff's regularly scheduled annual performance review was conducted on June 26, 2004.  Filing 29, ex. C (Lowry affidavit), ¶ 5 and att. 2.  Lowry's written comments noted that Wilde had shown an inability to make common sense decisions, tended to overreact to situations, is afraid of dogs, and had repeatedly violated the City's computer use policy.  Filing 29, ex. C (Lowry affidavit), att. 2.  Lowry implemented an evaluation method which assigned numeric values to each task listed on the evaluation form and tabulated these scores to determine if a merit increase was warranted.  Filing 29, ex. C (Lowry affidavit), ¶ 5.  This was the second year Lowry had acted in this capacity; Wilde's prior annual reviews were conducted by his then first-line supervisor, Weverka.  The tabulated evaluation score for Wilde in 2004 was lower than required to receive a merit increase in pay.  Wilde was therefore denied an annual raise.  Filing 29, ex. C (Lowry affidavit), ¶ 5.

Wilde disagreed with his 2004 annual evaluation scores, the evaluation method used by Lowry, and the fact that he would not receive a raise.  He told Lowry and Weverka that he believed he was being treated different than other employees because of his disabilities and the disabilities of his family.  Filing 29, ex. E (Reuter affidavit), atts. 4 & 5.  Wilde specifically argues that Lowry invented the numerical method used for his evaluation, and that the use of this method was inconsistent with "how it was supposed to be done."  Filing 33, ex. 1 (wilde declaration), ¶ 9.  There is no evidence that Lowry's evaluation method violated any City policy or procedure, or that this numerical evaluation method was not likewise used by Lowry in completing performance evaluations for Wilde's co-workers.

12

Between June 26 and July 6, 2004, Wilde filed a union grievance about his evaluation. Filing 29, ex. A (Dart affidavit), ¶7 & att. 5. In his grievance, Wilde objected to comments in his 2004 annual evaluation indicating he was afraid of dogs and had misused City computers. Wilde claimed he was not afraid of dogs and that he was not working at the time the computer was allegedly used inappropriately. Filing 29, ex. A (Dart affidavit), ¶7 & att. 5.

     5.     Wilde's Employment Applications.

Patricia Kant, Personnel Coordinator for the City, assists City departments in investigating potential disciplinary circumstances. She had been asked to assist Lowry and Weverka in the June 22, 2004 disciplinary process involving Wilde. Filing 29, ex. D (Kant affidavit), ¶ 3. After the June 22, 2004 meeting was held, and based on comments made by Wilde during that meeting, Kant began scrutinizing Wilde's employment applications on file with the City. During the course of that investigation, she was also notified that Wilde had filed a grievance related to the discipline imposed on June 22, 2004. Filing 29, ex. D (Kant affidavit), ¶ 3.

City employees must submit an application when applying for any promotion or transfer. Wilde had submitted employment applications with the City in 1997, 1998, 2001 and 2003. Filing 29, ex. D (Kant affidavit), ¶¶ 3 & 5; filing 33, ex. 1 (Wilde declaration), ¶ 13. Kant's investigation of these applications noted disparities in the information provided. Specifically, Wilde's description of his level of education, military background, and work experience were inconsistent and inaccurate. Filing 29, ex. D (Kant affidavit), ¶¶ 5-8; ex. E (Reuter affidavit), att. 2 (Wilde deposition), 73:2-74:24. Kant also noted that all four applications stated Wilde had never been convicted of a crime other than a minor traffic violation. However, Kant had discovered Wilde was convicted of theft in 1992. Filing 29, ex. D (Kant affidavit), ¶ 9 and att. 5.

13

6.      The July 27, 2004 Grievance Meeting and Pre-disciplinary Hearing.

On July 6, 2004, Wilde was notified that a pre-disciplinary meeting would be held on July 13, 2004.  Filing 29, ex. A (Dart affidavit), ¶6 & att. 4.  The purpose of the pre-disciplinary hearing was to determine whether Wilde had:

- •     falsified his time sheets and received excess pay, (see filing 29, ex. A (Dart affidavit), ¶3);

- •     violated City regulations by wearing his uniform in public while off duty,  (see filing 29, ex. A (Dart affidavit), ¶4);

- •     improperly used his city vehicle while off duty,  (see filing 29, ex. A (Dart affidavit), ¶4); and

- •     submitted false employment applications,  (see filing 29, ex. A (Dart affidavit), ¶5).

Filing 29, ex. A (Dart affidavit), ¶6 & att. 4.

The pre-disciplinary hearing was postponed to July 27, 2004 to accommodate the schedules of those attending.  Filing 29, ex. A (Dart affidavit), ¶7 & att. 4.  The meeting on Wilde's pending union grievance was scheduled to be held immediately prior to the pre-disciplinary hearing.  Filing 29, ex. A (Dart affidavit), ¶7 & att. 4.

At the July 27, 2004 pre-disciplinary hearing, the City presented a summary of its suspicions regarding Wilde.  Filing 29, ex. D (Kant affidavit), ¶ 12).  Wilde was represented by counsel, Gary Young, during this hearing.  Wilde provided a copy of his college transcript in response to the City's claim that he misrepresented his college attendance.   Filing 33 , ex. 1 (Wilde declaration), ¶ 7 and ex. C.  He denied falsifying his time sheets, and stated there were inconsistencies in record-keeping by

14

both parties.  Filing 33 , ex. 1 (Wilde declaration), ¶ 11.  However, he acknowledges that as a result of the time sheet discussion on July 27, 2004, the City could have concluded that either Wilde had falsified his time sheets or record-keeping was insufficient to verify the hours he worked.  Filing 29, ex. E (Reuter affidavit), att. 2 (Wilde deposition), 168:3-9.

Wilde consulted with Young following the pre-disciplinary hearing.  According to Wilde, Young stated he did not believe the explanations provided by Wilde at the July 27, 2006 pre-disciplinary hearing, and he did not think the City believed those explanations.   Filing 29, ex. E (Reuter affidavit), att. 2 (Wilde deposition), 190:9-191:25.   Young reportedly stated that the City's representatives were "sharks who smell blood" and their actions at the pre-disciplinary hearing  were "formalities to a hanging."   Filing 29, ex. E (Reuter affidavit), att. 2 (Wilde deposition), 190:17-191:6;  filing 33 , ex. 1 (Wilde declaration), ¶ 14.   Young advised Wilde that the City's disciplinary determination would likely be termination of Wilde's employment.  Accordingly, Wilde believed he was going to be fired and had no choice but to resign.  Filing 29, ex. E (Reuter affidavit), att. 2 (Wilde deposition), 190:17-191:6;  filing 33 , ex. 1 (Wilde declaration), ¶ 14.

On July 30, 2004, Wilde's attorney, Gary Young, contacted the City's Personnel Director, Don Taute, and requested that the City forego making a disciplinary determination in exchange for Wilde resigning effective August 31, 2004.  The City accepted this offer and allowed Wilde to tender a written resignation.  Wilde tendered his resignation on July 30, 2004 effective August 31, 2006.   Filing 29, ex. A (Dart affidavit), ¶9 & att. 6.   Thereafter, Wilde continued to work for the City until August 31, 2004.  The City never  made a disciplinary determination relating to the issues discussed as the July 27, 2004 pre-disciplinary hearing, and Wilde's personnel file contains no notations of discipline stemming from that hearing.  Filing 29, ex. E (Reuter affidavit), att. 1, 4:1-5:4.

15

## LEGAL ANALYSIS

Wilde claims the City penalized him for attempting to use or using Family Medical Leave and that it violated the ADA by treating him different than non-disabled individuals who do not have disabled family members.  Filing 32 (plaintiff's brief), p. 1.  He claims "he was written up, evaluated poorly, was in the process of being terminated and he was actually or constructively discharged."  Id.   The City has moved for summary judgment on both the FMLA and ADA claims.

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  The ultimate burden of proof is on the movant to establish that there are no material facts in dispute and that, as a matter of law, the movant is entitled to judgment.  Fed.R.Civ.P. 56(c); Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In deciding a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences without assessing credibility.  Breeding v. Arthur J. Gallagher and Co., 164 F.3d 1151, 1156 (8th Cir. 1999).

Although "summary judgment should seldom be granted in discrimination cases," (Bassett v. City of Minneapolis, 211 F.3d 1097, 1099 (8th Cir. 2000)), summary judgment should be granted in a discrimination case when the plaintiff has failed to present "any significant probative evidence tending to support the complaint," or has failed to "make a sufficient showing on every essential element of its claim on which it bears the burden of proof."  Buettner v. Arch Coal Sales Co., Inc., 216 F.3d 707, 718 (8th Cir. 2000).  "[T]he focus of inquiry at the summary judgment stage 'always remains on the ultimate question of law: whether the evidence is sufficient to create a genuine issue of fact as to whether the employer intentionally

16

discriminated against the plaintiff because of [the protected characteristic].' " Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1018 (8th Cir.2005) (quoting Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328, 1336-37 (8th Cir.1996)).

## I.    FMLA Claim.

Employees can assert two distinct types of claims under the FMLA. Interference or "(a) (1)" claims arise when an employer has denied or interfered with an employee's exercise of substantive rights under the FMLA, while  retaliation or "(a)(2)" claims arise when the employer has discriminated against an employee who has exercised those rights.   The prima facie evidence required for these claims differs.

A plaintiff asserting a prima facie claim for FMLA interference  must establish (1) that he was entitled to FMLA leave, (2) that some adverse action by the employer interfered with his right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of his FMLA rights.  Campbell v. Gambro Healthcare, Inc., 2007 WL 706934, *4 (10th Cir. 2007).  "Interference includes 'not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.'"  Stallings v. Hussmann Corp., 447 F.3d 1041, 1050 (8th Cir. 2006)(quoting 29 C.F.R. § 825.220(b)).  An employer interferes with the exercise of protected FMLA rights when, due to consequences imposed by the employer, employees become reluctant to exercise their rights for fear of being fired or disciplined.  Stallings, 447 F.3d at 1050.

A plaintiff claiming discriminatory retaliation in violation of the FMLA must present evidence that:  (1) he exercised rights protected under the FMLA; (2) was adversely affected by an employment decision; and (3) there was a causal connection between exercising his rights under the FMLA and the adverse employment decision. McBurney v. Stew Hansen's Dodge City, Inc., 398 F.3d 998, 1002 (8th Cir. 2005).  An

17

FMLA retaliation claim requires proof of retaliatory intent, but an employee pursuing an FMLA interference claim need only show that he was entitled to the benefit denied.  Stallings, 447 F.3d at 1050.  Unlike FMLA interference claims, retaliation claims are analyzed under the McDonnell Douglas burden-shifting framework. Stallings, 447 F.3d at 1051.  See also Campbell, 2007 WL 706934, *4.

A broad reading of Wilde's brief indicates he may be asserting both an FMLA interference and an FMLA retaliation claim.   He argues:

> The Plaintiff was required to take leave for the serious health needs of his family and the city noted his leave as FMLA but continually counseled him and evaluated him such to discourage the taking of leave. The Plaintiff's 2003 evaluations include comments on his use of sick leave and family leave. . . .  Plaintiff contends he was discouraged from taking the leave and his adverse treatment was caused by his taking the necessary Family Medical Leave, thus the Defendant's motion must be overruled on the FMLA claim.

Filing 32 (plaintiff's brief), p. 12.  Accordingly, it appears Wilde is claiming he was both discouraged from exercising his FMLA rights and, as to those rights he did exercise, he was adversely evaluated and unjustifiably disciplined.

1.    FMLA Interference Claim.

The FMLA provides that an eligible employee is entitled to a total of twelve workweeks of leave during any twelve-month period to take care of certain relatives with a "serious health condition," or when the employee himself cannot "perform the functions" of his position because he suffers from a "serious health condition." Ragsdale v. Wolverine Worldwide, Inc.  218 F.3d 933, 936 (8th Cir. 2000)(quoting 29 U.S.C. § 2612(a)(1)).

18

An employee is not entitled to FMLA leave unless he notifies the employer that he plans to take FMLA leave. <u>Stallings</u>, 447 F.3d at 1050. "A claim under the FMLA cannot succeed unless the plaintiff can show that he gave his employer adequate and timely notice of his need for leave, and an employer has the right to request supporting information from the employee." <u>Woods v. DaimlerChrysler Corp.</u>, 409 F.3d 984, 991 (8th Cir. 2005). Repeated requests for "sick leave" do not provide notice to the employer that the employee is seeking to exercise rights under the FMLA. "While the employee does not have to mention FMLA by name, the employee has an affirmative duty to indicate both the need and the reason for the leave." <u>Sanders v. May Dept. Stores Co.</u>, 315 F.3d 940, 944 (8th Cir. 2003). The employee must inform the employer that leave is needed because of a "serious health condition." <u>Woods</u>, 409 F.3d at 992-93 (affirming summary judgment for the employer in an FMLA action where the employee left voicemail messages stating he was seeing a doctor, and ten days later explained he was absent from work because he was stressed and felt his health was at risk, but prior to his employment termination, never provided medical documentation stating the absence was due to a serious health condition); <u>Carter v. Ford Motor Co.</u>, 121 F.3d 1146, 1148 (8th Cir. 1997)(affirming summary judgment for the employer in an FMLA action where the employer terminated an employee who called in "sick," because even assuming the employee had a "serious health condition" within the meaning of the act, he never notified the employer of his need to take leave due to that illness); <u>Collins</u>, 272 F.3d at 1008 (holding the employer was not liable under the FMLA where the employee was diagnosed with depression and repeatedly called in "sick," but failed to tell the employer that the her absences were caused by the depression); <u>Medina-Salas v. Tyson Fresh Meats, Inc</u>. 2006 WL 2707444, *8 (D.Ne. 2006)(holding the employer was entitled to summary judgment where the employee used excessive "sick leave," but did not provide any physician documentation establishing that these absences were due to a serious health condition).

19

Wilde has failed to produce evidence showing he was entitled to FMLA leave. While Wilde's declaration states he has Bipolar Disorder and PTSD, there is no admissible evidence that the severity of these disorders or conditions rendered him unable to "perform the functions" of his position. 29 U.S.C. § 2612(a)(1). To the contrary, the parties have stipulated that Wilde was at all times able to perform the functions of his position without accommodations. Filing 29, ex. E (Reuter affidavit), att. 1 (Wilde deposition), 36:9-17.

Wilde argues, however, that he was "required to take leave for the serious health needs of his family." Filing 32, (plaintiff's brief), p. 12. The record does not support this conclusory statement. There is evidence that members of Wilde's family have been diagnosed with physical and/or mental health conditions, but there is no evidence that Wilde used or requested to use sick leave to attend to the needs of a family member because that family member was experiencing symptoms of or complications related to a "serious health condition." There is likewise no evidence that Wilde ever advised the City that his sick leave requests were made for this purpose.

Wilde has also failed to submit a prima facie showing that the City interfered with his use of FMLA leave. Even assuming he or his family members have "serious health conditions" as that term is interpreted under the FMLA, Wilde requested "sick leave," and not Family Medical Leave. His right to use sick leave was governed by union agreement and, periodically, his requests for "sick leave" exceeded the terms of that agreement. For that he was counseled. However, he readily admits that during the entirety of his employment with Animal Control, his requests to take sick leave-- either for himself or to care of a family member--were never denied. Under such circumstances, the City's act of counseling Wilde to avoid using sick leave at a rate exceeding that permitted under his union agreement, and encouraging him to accumulate it for future use in the event of a major illness, cannot reasonably be construed as an adverse employment action which discouraged Wilde from exercising

20

of rights under the FMLA.  See e.g. <u>Stallings</u>,  447 F.3d at 1051 (concluding no FMLA interference claim existed where the employer granted every request made by the employee to take FMLA leave).

I therefore conclude the plaintiff has failed to present a prima facie claim for FMLA interference.

2.    <u>FMLA Retaliation Claim</u>.

To submit a prima facie claims for FMLA retaliation, Wilde must present some evidence that he exercised rights protected under the FMLA.  <u>McBurney</u>, 398 F.3d at 1002.   Wilde argues that his sick leave was actually Family Medical Leave, that he was terminated  from his employment, and that this "adverse treatment was caused by his taking . . . necessary Family Medical Leave."  Filing 32 (plaintiff's brief), p. 12.

To survive summary judgment, "the plaintiff must establish a prima facie case of employment discrimination. If established, the employer may advance a legitimate, nondiscriminatory reason for the employee's discharge. The burden of production then returns to the plaintiff to show that the employer's reason is a pretext for [discriminatory retaliation in violation of the FMLA]." <u>Canady v. Wal-Mart Stores, Inc.</u>, 440 F.3d 1031, 1034 (8th Cir. 2006); <u>Stallings</u>, 447 F.3d at 1051 (holding FMLA interference claims are analyzed under the <u>McDonnell Douglas</u> burden-shifting framework).  To succeed at the pretext stage, the plaintiff "must prove that the prohibited reason was a determinative factor in [the employer's] decision to terminate." <u>Jones v. United Parcel Svc., Inc.</u>, 461 F.3d 982 (8th Cir. 2006).

For the reasons already discussed, Wilde's use of sick leave cannot reasonably construed as taking Family Medical Leave.   However, even assuming Wilde exercised rights under the FMLA and was "actually or constructively discharged"

21

from his employment, (filing 32 (plaintiff's brief), p. 12), the City has affirmatively shown that it had a legitimate, non-discriminatory reasons for giving Wilde a marginal 2004 performance evaluation, denying his annual merit raise, and initiating pre-disciplinary proceedings.   The city had reason to believe Wilde interacted inappropriately with  a citizen over a snapping turtle, perhaps violating city policies and traffic laws in the course of that incident.   Filing 33, ex. 1 (Wilde declaration), ¶ 7.  Wilde does not admit to playing games on his computer in 2004, but he does state his supervisor, Lowry, saw a "pop-up" on Wilde's computer screen which may or may not have been a game.  Filing 33, ex. 1 (Wilde declaration), ¶ 6. The City had issued several warnings concerning the improper use of City computers, one directed specifically at Wilde, and violations of the City's computer use policy had cost the City time and money.  Wilde admits he went to a restaurant with his wife, in uniform and in a City vehicle, in violation of City policies.   Filing 33, ex. 1 (Wilde declaration), ¶ 12.  It is undisputed that the hours reflected on Wilde's time cards were not verified because of inconsistencies in his record-keeping.  Filing 33, ex. 1 (Wilde declaration), ¶ 11.  Finally, and perhaps most importantly, it is undisputed that Wilde's employment applications were inconsistent and not entirely truthful in the fundamental areas of educational background, military experience, and criminal history.  Filing 33, ex. 1 (Wilde declaration), ¶ 13.

Wilde claims the City raised these claims as a pretext to discriminate against him for using Family Medical Leave; that after he told Lowry he had Bipolar Disorder in early 2004, the City began looking for reasons to force him out or fire him.  As to the snapping turtle incident, he claims this citizen complaint is false, and citizen complaints are usually not taken seriously and are ignored.   Filing 33, ex. 1 (Wilde declaration), ¶ 7.  As to the computer game issue, he responds that the problem of improper computer use is widespread in the Animal Control department, and Lowry said nothing at the time.  Filing 33, ex. 1 (Wilde declaration), ¶ 6.  Wilde claims the restaurant incident was justified by medical exigencies, and as to Wilde's time cards and record-keeping, the City's record-keeping is no better than his.

Finally, he claims the City never looked closely at his applications until 2004, and the pre-disciplinary hearing was "a product of excessive investigation into my past." Filing 33, ex. 1 (Wilde declaration), ¶ 10.

None of these explanations presents probative evidence that the City's stated reasons for "actually or constructively discharging" Wilde were a pretext for discrimination based on using Family Medical Leave. Wilde argues that the city did not begin to over-scrutinize his work until after he told Lowry he had Bipolar Disorder and had exhausted his sick leave. Of note, Wilde was counseled regarding his excessive use of sick leave in both 2002 and 2003, but nonetheless received good evaluations and raises during both years. Moreover, timing alone is not sufficient to show that an employer's non-discriminatory and non-retaliatory reason for an adverse employment action was merely a pretext. Logan v. Liberty Healthcare Corp., 416 F.3d 877, 881 (8th Cir. 2005). Other than Wilde's conclusory statements, there is no evidence that other employees who committed the same or similar conduct as Wilde were not likewise given poor evaluations, denied pay increases, or subjected to disciplinary hearings.

Wilde has failed to show he exercised rights protected under the FMLA, and he has failed to show that the City treated him adversely because he took Family Medical Leave. I therefore conclude the plaintiff has failed to present a prima facie claim for FMLA retaliation.

## II.   ADA Claim.

Wilde claims he was discriminated against in violation of the Americans with Disabilities Act (ADA) both due to his own disability and due to the disabilities of his wife and children. An aggrieved employee seeking relief under the ADA must establish: 1) he has a disability as defined in 42 U.S.C. § 12102(2); 2) he is qualified to perform the essential functions of the job, with or without reasonable

23

accommodation; and 3) he has suffered adverse employment action because of his disability.  The employee retains the burden of persuading the trier of fact that he has been the victim of illegal discrimination due to his disability.  Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir. 1995).

The City argues that Wilde cannot show that he or his family members are disabled for the purposes of the ADA, and he  cannot show an adverse employment action was imposed because of his disability.  I agree.

A person is disabled within the meaning of the ADA if he demonstrates that he has a physical or mental impairment which substantially limits one or more of his major life activities, that he has a record of such an impairment, or that he is regarded as having such an impairment.  Amir v. St. Louis University,  184 F.3d 1017, 1027 (8th Cir. 1999).   Major life activities include functions such as "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  28 C.F.R. § 36.104.

> To prove disability, plaintiffs must submit more than just evidence of a medical diagnosis of an impairment. . . .  Instead, the ADA requires those claiming the Act's protection to prove a disability by offering evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial.  In other words, the relevant inquiry when addressing the major life activity of performing manual tasks is whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with his specific job. The type of evidence most relevant to establishing a substantial limitation in the major life activity of performing manual tasks, includes, for example, an individual's ability to do household chores, bathe, brush one's teeth, prepare meals, do laundry, etc.

Philip v. Ford Motor Co., 328 F.3d 1020, 1024-25 (8th Cir. 2003)(internal citations and quotations omitted).

24

Wilde has submitted evidence that he has Bipolar Disorder and PTSD, and that his family members have been diagnosed with various physical and/or mental illnesses or disorders.  However, he has cited no specific evidence or examples of how his (or his family members') physical or mental limitations have substantially limited his ability to perform tasks central to most people's daily lives.  Though Wilde claims he frequently awakens during the night and suffers from insomnia, this problem is rather common.  "An individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person." Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 199 (2002).

Wilde has failed to show that the severity of his sleep disruptions or insomnia have substantially limited his ability to function, or how specifically these problems have impacted his life.  He has likewise failed to explain how his difficulty "bringing [his] intelligence to the surface" (filing 33 , ex. 1 (Wilde declaration), ¶ 17) has impacted or limited any activities of his life.

Absent evidence concerning the actual impact of any impairments on the life of Wilde or his family members, or that this impact is substantial, the plaintiff has failed to show he or his family members are or were perceived to be disabled.  For the reasons previously discussed regarding the FMLA retaliation claim, I further conclude Wilde has failed to produce evidence showing the City imposed any adverse employment action on him because he or his family members were disabled or were perceived to be disabled.   I therefore conclude the plaintiff has failed to present a prima facie claim for discrimination in violation of the ADA.

"'Sick' does not imply 'a serious health condition'" for the purposes of the FMLA.  Collins,  272 F.3d at 1008.  "Diagnosis" does not imply "disabled" for the purposes of the ADA.  Toyota Motor Mfg., 534 U.S. at 198.  I find the plaintiff has

25

failed to present a prima facie claim that the City violated either the FMLA or the ADA, and the City is entitled to judgment as a matter of law.

IT IS ORDERED:

1.      The City's motion to strike, filing 37, is granted in part and denied in part.   The July 28, 2004 medical record of Susan Johnson, M. D. submitted as the exhibit F attachment to the plaintiff's declaration, (filing 33, ex. 1 (Wilde's declaration), ex. F), is stricken.  In all other respects, the City's motion to strike is denied.

2.      The defendant's motion for summary judgment, filing 27, is granted.

3.      This case is dismissed in its entirety.

4.      Judgment shall be entered by separate document.

March 27, 2007.                              BY THE COURT

                                             s/ *Richard G. Kopf*
                                             United States District Judge

26